Scott F. Gautier (State Bar No. 211742)
*sgautier@pwkllp.com*
Lorie A. Ball (State Bar No. 210703)
*lball@pwkllp.com*
Thor D. McLaughlin (State Bar No. 257864)
*tmclaughlin@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Proposed Attorneys for Debtor and Debtor-in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>ECOLY INTERNATIONAL, INC., a California corporation,<br><br>      Debtor and Debtor-in-possession. | Bk. Case No.:<br><br>Chapter 11<br><br>**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF "FIRST-DAY" MOTIONS** |

I, T. Scott Avila, hereby declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of Sexy Hair Concepts, LLC ("SHC"), as well as its parent-affiliates, Ecoly International, Inc. ("Ecoly" or "Debtor") and Luxe Beauty Midco Corporation ("Midco") (collectively, the "Debtors").  In my capacity as CRO, I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, I could and would competently testify thereto.

2.      In my capacity as CRO, I am responsible for all issues related to, *inter alia,* the Debtors' business plans and strategies with respect to a workout, restructuring or reorganization of its financial obligations, including (i) communicating and negotiating with the Debtors' senior secured and subordinated lenders, (ii) the investigation and execution of the Debtors' options with respect to a

restructuring or refinancing and (iii) any proposed reorganization of the Debtors to satisfy creditor claims and provide value to stakeholders.

3.     I have been involved in all aspects of the Debtors' planning process with respect to their petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") including the negotiation of cash collateral and debtor-in-possession financing and proposed plan of reorganization.

4.     On the date of the filing of this declaration (the "Petition Date"), the Debtors filed petitions (the "Petitions") for relief under chapter 11 of the Bankruptcy Code in order to effectuate a plan of reorganization (the "Plan") to maximize value for all creditors and other stakeholders.

5.     I make this Declaration in support of two motions filed by the Debtor seeking emergency relief, as well as relief on regular notice, including the following motions:

    i.     Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 361, 363 and 364: (A) Authorizing Use of Cash Collateral, (B) Authorizing Debtor to Incur Post-Petition Indebtedness, (C) Granting Security Interests, (D) Authorizing Adequate Protection, and (E) Granting Other Relief; and

    ii.     Motion For Joint Administration of Estates

6.     All capitalized terms that are used, but not defined, herein, shall have the meanings ascribed to such terms in the associated motion or application.  For the convenience of the Court and parties in interest, this declaration is organized with "headings" that identify general background facts that are commonly germane to most motions and applications and those facts that are specifically relevant to particular motions.

# I.     General Background Facts

## A.     Business and Organization

7.     In April, 2008, Ecoly, the sole managing member of SHC, was purchased in a private sale transaction, led by the private equity firm Thoma Bravo, LLC ("Thoma Bravo"), that resulted in the formation of Luxe Beauty Holdings Corporation ("Holdings") and Midco (the "2008 Transaction").

8.     An organization chart showing (i) the relationship between SHC, Midco and Ecoly and

(ii) SHC's understanding of the shareholder ownership of Holdings is attached hereto as Exhibit A.

9.    SHC is an operating company engaged in the distribution and marketing of hair-care products and brands.  SHC outsources the production and manufacture of its various lines of premier salon products and operates from a single facility in Chatsworth, California that houses its corporate offices and distribution warehouse.  SHC works with several distributors domestically and internationally, but does not maintain any other offices.  The Debtors have been in the hair care product business since 1994 and formed SHC in 2001 to act as the operating entity.

10.    The Debtors' current chief executive officer ("CEO"), Karl-Heinz Pitsch ("Pitsch"), was initially hired by the Debtors in November 2008 to act as the chief operating officer.  In the spring of 2009 he was appointed as the CEO.  He oversees all of the Debtors' ordinary course operations and is key to the Debtors' relationships with its vendors and clients.  Mark Milner ("Milner"), the Debtors' current chief financial officer ("CFO"), was hired in January 2009.  He oversees the financial operations of the Debtors in the ordinary course of operations and maintains the Debtors' books and records.

**B.    Pre-Petition Debt and Financing**

11.    In connection with the 2008 Transaction, SHC borrowed funds from a syndicate of secured lenders (the "Senior Secured Lenders"), pursuant to the terms of a Credit Agreement dated April 9, 2008 (as amended and in effect, the "Credit Agreement").  A true and correct copy of the Credit Agreement is attached hereto as Exhibit B.  The Bank of Montreal ("BMO" or the "Agent") as successor to Bank of America, N.A., (the original Administrative Agent and Collateral Agent) is the Administrative Agent and Collateral Agent for the Senior Secured Lenders under the Credit Agreement.

12.    Under the Credit Agreement, the Senior Secured Lenders initially made a term loan to SHC of approximately $65 million and provided a revolving line of credit of approximately $7 million (the "Senior Secured Loans").  Holdings, Midco and Ecoly guaranteed the obligations under the Credit Agreement.  As of the Petition Date, the outstanding amount owing under the Credit Agreement is $62,580,138.16.

13.    Pursuant to the terms of the Credit Agreement and an executed Security Agreement

between Debtors and Senior Secured Lenders, the Debtors and Holdings granted the Agent a security interest in all of the their assets.  A true and correct copy of the Security Agreement is attached hereto as Exhibit C.  The Agent asserts that it holds, for the benefit of the Senior Secured Lenders, a valid, perfected and enforceable security interest in all of the Debtors' assets, including assets that constitute "cash collateral" as defined in section 363(a) of the Bankruptcy Code.  SHC is not aware of any defects in the collateral coverage over the assets pledged to the Agent.  True and correct copies of the UCC-1 Financing Statements filed by the Bank of America, N.A., the former Administrative and Collateral Agent for the Senior Secured Lenders, on April 9, 2008, are attached hereto as Exhibit D.

14.    Additionally, pursuant to the terms of an executed pledge agreement between Debtors and Senior Secured Lenders, the Debtors and Holdings pledged their respective shares and membership interests to the Senior Secured Lenders ("Pledge Agreement").  A true and correct copy of the Pledge Agreement is attached hereto as Exhibit E.

15.    In addition, SHC incurred obligations to Northwestern Mutual Life Insurance Company ("NML" or the "Subordinated Lender").  Subordinated unsecured notes (the "Subordinated Notes") were issued by SHC on April 9, 2008 to NML pursuant to the terms of the Securities Purchase and Guaranty Agreement of the same date (the "SPGA").  A true and correct copy of the SPGA is attached hereto as Exhibit F.  The Subordinated Notes are guaranteed by the same entities that guaranteed the Credit Agreement: Holdings, Ecoly and Midco.  However, the Subordinated Notes were provided on an unsecured basis.  Furthermore, the Subordinated Notes are contractually subordinated to all amounts owed to the Senior Secured Lenders pursuant to an Intercreditor Agreement between the Agent and the Subordinated Lender.  A true and correct copy of the Intercreditor Agreement is attached hereto as Exhibit G.  The outstanding prepetition amount owed in respect of the Subordinated Notes is approximately $25,000,000.

16.    In connection with the 2008 Transaction, Holdings may have a remaining obligation to the original selling shareholders pursuant to a Securities Purchase Agreement dated March 18, 2008 (the "Holdback") in the principal amount of approximately $8.5 million.  My understanding is that Holdings and the Debtors dispute any Holdback obligation.

17.    In addition, in connection with the 2008 Transaction, Ecoly received a Promissory

Note from James Morrison in the principal sum of $1,916,298.64 payable upon demand (the "Morrison Note"). My understanding is that the Debtors are uncertain as to the collectability of the Morrison Note.

18.    In the ordinary course of its business, SHC had approximately $3,958,663.00 of accounts payable to and $7,694,819.00 of accounts receivable from trade vendors and customers as of the Petition Date.

### C.    Financial and Debt Covenant Defaults

19.    In December of 2008, SHC reported to the Agent and the Subordinated Lender that, due in part to the state of the global economy and a substantial drop in consumer spending, it would be in default of certain financial covenants under the Credit Agreement, and that it was unable to fill certain orders, had overestimated manufacturer rebates and was concerned about the ability of one of its largest customers to pay, which led to a need to increase account receivable reserves.

20.    In June of 2009, SHC was unable to make installment payments then due and owing under the Credit Agreement. The Agent has declared that payment and other covenant defaults under the Credit Agreement are ongoing. In addition, SHC was also unable to make payments due and owing under the Subordinated Note Agreement and received a notice of default from NML. NML has declared that payment and other defaults under the Subordinated Note Agreement are ongoing.

21.    On July 23, 2009, the Agent exercised voting rights with respect to the pledged shares of stock in Midco and Ecoly and, as a result, by unanimous shareholder consent, (i) the directors then serving on the Board of Directors of Midco and Ecoly were removed; (ii) Michael Frow, Marilyn Sylvestre and John G. (Pete) Ball were appointed as the independent directors of Midco and Ecoly (collectively, the "Board"); (iii) Andre Laus was elected to serve as the Chief Restructuring Officer ("CRO") of Midco and Ecoly; (iv) Ecoly, the sole member of SHC, was authorized and directed to elect Andre Laus to serve as CRO of SHC; and (v) Andre Laus was authorized and directed to hire CRG Partners Group, LLC, to assist him in his capacity as CRO. At the direction and by resolution of the Board, I later replaced Andre Laus as CRO for the Debtors.

22.    Around this time, the Senior Secured Lenders indicated their intent to foreclose and liquidate the stock of Ecoly and Midco, and to foreclose and liquidate all assets of SHC, to satisfy the

obligations due and owing under the Credit Agreement unless the Debtors cured all defaults and repaid all or a significant portion of the outstanding obligations.

### D.    Attempted Financial Restructuring and Sale Efforts

23.    Initially, Andre Laus attempted to negotiate with the Debtors, NML and the Senior Secured Lenders to facilitate a refinancing or restructuring of the Debtors' loan obligations.  When it became obvious that the parties were at an impasse, the Board elected to retain the law firm of Peitzman, Weg & Kempinsky LLP ("PWK") and the investment banking firm of Imperial Capital, LLC ("Imperial") to assist the Debtors in, among other things, negotiations with the Senior Secured Lenders and NML, attempts to refinance or restructure their debt obligations or, failing those alternatives, facilitating a sale of SHC to maximize value for creditors and stakeholders.  Although the Senior Secured Lenders would not agree to a written forbearance agreement, the Senior Secured Lenders and Agent orally agreed to work with the Debtors from month to month provided that the Debtors continued to work in good faith to remedy existing defaults under the Credit Agreement, refinance the debt obligations, or liquidate their assets for the benefit of creditors and stakeholders.  Specifically, although the Agent delivered a notice of intent to conduct a public foreclosure sale of all of the equity interests of Midco and Ecoly and, subsequently, all of the assets of SHC, the Agent also extended the sale date from time to time.

24.    Upon retention, Imperial worked to identify potential sources of refinancing for the Senior Secured Loans and the Subordinated Notes.  Specifically, Imperial first worked closely with NML and Holdings' shareholders, most notably Thoma Bravo, providing it with the exclusive right to propose a restructuring or refinancing transaction to the Senior Secured Lenders.  NML and Thoma Bravo proposed a cash pay-down of approximately $20 million of the Senior Secured Loans, but the Senior Secured Lenders rejected that offer.  No other material offers were made by NML and Thoma Bravo.

25.    Subsequently, Imperial began contacting third party lenders and investors to either (i) partner with NML to make a new proposal to the Senior Secured Lenders, (ii) purchase all or a portion of NML's debt, or (iii) refinance the Senior Secured Loans.  During this time, Imperial conducted regular phone calls with NML to keep it informed about indications of interest by third

parties and to determine if NML wanted to propose any alternative offers.  No further offers were made by NML.

26.    After this significant effort, Imperial informed the Debtors that it was unable to reach a suitable refinancing of the Debtors' debt obligations.  Given that the Senior Secured Lenders still intended to foreclose if the Debtors were not working to resolve their financial problems, the Board then elected to pursue a voluntary sale of substantially all of SHC's assets to maximize value for all creditors and stakeholders.

27.    Upon this decision, Imperial worked with SHC to prepare marketing materials and to identify potential purchasers.  Through this process, Imperial contacted over 180 potential purchasers and provided them with marketing materials regarding SHC's assets.  As a result of these efforts, Imperial assisted the Debtors in having potential purchasers with further interest in the assets sign non-disclosure agreements under which they could perform due diligence on the Debtors.  Over 100 potential purchasers signed such agreements and began to further investigate the Debtors' business and assets, including the review of a proposed asset purchase agreement jointly drafted by PWK and counsel for NML.  This marketing process occurred with cooperation from NML and its professional advisors and with continued month to month extensions of a foreclosure sale deadline from the Agent.

28.    After months of due diligence by interested parties, Imperial began an auction process in February, 2010, and invited any interested party to submit a bid for SHC's assets.  Three (3) parties submitted bids and Imperial and the Debtors evaluated the bids to determine the highest and best offer for SHC's assets.  Upon making this determination, SHC entered into a confidential letter of intent with a potential bidder (the "Initial Bidder") for the purchase of substantially all of SHC's assets.  The Initial Bidder then conducted extensive due diligence on the Debtors for the following one and one-half months and PWK and NML's counsel began negotiating an asset purchase agreement with the Initial Bidder's counsel.  Unfortunately, by April, 2010, the Initial Bidder informed the Debtors that it did not believe there was sufficient value in SHC's assets and that it was terminating its letter of intent.

29.    Imperial then recommended that the Debtors turn to the next highest bidder, which it

believed was likely to be able to close a transaction on terms favorable to the Debtors and their

stakeholders in a reasonable time period.  Upon learning that the next highest bidder was still

interested in purchasing SHC's assets, the Debtors commenced negotiations and diligence with that

bidder, Sexy Hair, Inc., who is the current plan sponsor (the "Plan Sponsor").

### E. Events Leading To The Filing of A Chapter 11 Petition

30.    Through the late spring and early summer of 2010, the Debtors and Plan Sponsor

(collectively, the "Parties") anticipated consummating a sale to the Plan Sponsor outside of

bankruptcy.  Debtors' counsel and NML's counsel began negotiating and drafting an asset purchase

agreement with the Plan Sponsor's counsel.  The Parties ultimately agreed on most of the material

terms of a cash purchase transaction, including the purchase price.  The Plan Sponsor had, in addition

to its own cash, arranged for $35 million of committed outside financing in order to consummate the

transaction.  However, as the Plan Sponsor began its diligence process, it discovered structural,

financial, regulatory and general industry risks affecting the Debtors.  Due to these issues, the Plan

Sponsor believed there were risks associated with a consensual out-of-court transaction.

31.    As a result, the Plan Sponsor requested that the transaction be effectuated through a

foreclosure sale.  In an effort to ensure the completion of the transaction, the Debtors agreed to

cooperate with a foreclosure sale process provided it returned the same value to its stakeholders.

However, a foreclosure transaction on an operating business of SHC's size is not very common, and

the financing source of the Plan Sponsor was concerned that it would not be able to syndicate the loan

with a non-standard structure for the purchase.

32.    Accordingly, the Plan Sponsor then requested that the proposed sale transaction be

structured as a sale in a chapter 11 case pursuant to Bankruptcy Code section 363.  In their continued

endeavor to maximize value for the benefit of all stakeholders, the Debtors agreed to file chapter 11

bankruptcies and consummate an asset sale with the Plan Sponsor.  Notably, at about this time, an

industry-wide class-action lawsuit was filed, naming a number of defendants, including SHC, for

alleged violations of certain advertising and competition laws, including the Lanham Act (the "Class

Action Lawsuit").

33.    After extended negotiations among the Debtors, NML and the Plan Sponsor, it became

uncertain whether terms for the asset sale pursuant to Bankruptcy Code section 363 could be agreed upon.  At a meeting of the Board, NML, as a Board observer, expressed that it was not in favor of the Debtors pursuing a transaction with the Plan Sponsor because of the provisions in the proposed asset purchase agreement providing for (i) a $4 million indemnity holdback for breaches of, among other things, SHC's representations and warranties and a $6 million indemnity holdback for losses related to the Class Action Lawsuit, (ii) a termination fee payable to the Plan Sponsor in the event SHC breached its obligations under the proposed asset purchase agreement, and (iii) the broadly worded representations and warranties of SHC.  Based, in part, on this presentation made by NML, the Board determined that it would not go forward with a transaction with the Plan Sponsor on the current terms offered.  The Board determined that it would be willing to consummate a transaction with the Plan Sponsor if the terms were modified to be more favorable to the Debtors.

34.     After negotiations continued between the Debtors and the Plan Sponsor and the Plan Sponsor agreed to certain further changes, a final asset purchase agreement was approved by the Board and the Debtors prepared to file chapter 11 bankruptcies and propose a sale of SHC's assets pursuant to Bankruptcy Code section 363.  At this time, NML went further than merely indicating it would object to the sale when proposed in bankruptcy court.  NML took the position, via electronic correspondence to SHC, that, even if the Debtors signed an agreement to sell SHC's assets through an open and fair bankruptcy process, such a sale would be a violation of the SPGA.  Moreover, NML specifically sent the same email to the Plan Sponsor so that the Plan Sponsor could take notice of NML's position.  A true and correct copy of this email is attached hereto as Exhibit H.  The Plan Sponsor and its third-party financing source took this communication to be a direct threat that NML would sue them if a purchase agreement was signed, even if that purchase agreement specifically contemplated obtaining bankruptcy court approval for any sale.  While the Plan Sponsor was prepared to proceed with the transaction in spite of this threat from NML, the Plan Sponsor's financing source was not.

35.     At this point, the Plan Sponsor, the Agent, certain Senior Secured Lenders and the Debtors determined that they could proceed to support a plan of reorganization for SHC, on the terms now contained in the Plan and investment agreement (the "Investment Agreement").  The

reorganization would provide the Debtors with all of the prior benefits of the proposed sale transaction by having the Plan Sponsor infuse the same amount of new equity in exchange for the newly issued equity interests of Reorganized Debtor, with the Senior Secured Lenders receiving a significant cash pay-down on their debt and agreeing to take $35 million of restructured debt from the Reorganized Debtor (the "Transaction").  Certain Senior Secured Lenders agreed, pursuant to a plan support agreement (the "Plan Support Agreement"), to support the Plan. The cash remaining after paying down the Senior Secured Lenders' debt would be available to distribute to unsecured creditors (including the Subordinated Lender and any claims in the Class Action Lawsuit).  True and correct copies of the Investment Agreement, the Plan and the Plan Support Agreement are attached hereto as Exhibits I, J and K, respectively.

36.    After taking into consideration the substantial efforts that took place over the past year to resolve the Debtors' financial problems, the Board, based upon information and belief that the Plan Sponsor continues to represent the best proposal for returning the most value to the Debtors' creditors and other stakeholders, agreed that SHC will act as the Plan Proponent and submit the Plan for approval.  The Board specifically noted that, throughout the months of extended negotiations with the Plan Sponsor, Imperial continued to investigate and have discussions with NML and third parties regarding possible refinancing, restructuring or asset sale options, but that these options never provided anywhere near the value provided by the Plan Sponsor.

37.    The Board directed that, I, T. Scott Avila, execute the Investment Agreement with the Plan Sponsor and, that I take all actions necessary to file and facilitate chapter 11 bankruptcy cases on behalf of the Debtors.  Concurrent with the signing of the Investment Agreement, the Debtors filed individual petitions for relief under chapter 11 to effectuate the Plan.

## II.    Cash Collateral and DIP Financing

### A.    Cash Collateral and DIP Financing ("Cash Collateral/DIP Motion")

38.    The Senior Secured Lenders assert valid, perfected and enforceable security interests in all of the Debtors' assets, including assets that constitute "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral").

39.    Attached hereto as Exhibit L is a cash budget prepared by SHC (the "Budget").  The

Budget sets forth SHC's anticipated cash needs for approximately 13 weeks, through mid-March 2011[1]. As set forth in the Budget, SHC requires cash for, among other things: (1) payroll, (2) office expenses, (3) purchasing inventory, which in turn is sold to customers and generates receivables, and (4) other ordinary course obligations. With respect to the purchase of inventory, SHC has historically contracted with independent facilities that manufacture and package SHC's products, and SHC intends to continue that practice post-petition.

40.    In this case, SHC requires the use of the Cash Collateral to continue its business operations. SHC is profitable and is continuing to grow its business with significant going concern value. SHC believes that it can continue this growth and profitability, which in turn, will allow it to reorganize successfully. To accomplish this goal, however, SHC must continue to operate.

41.    Most importantly, SHC has a payroll payment due on December 24, 2010 and must continue to pay for inventory to generate new accounts receivables. This includes payment for the packaging of inventory in accordance with the terms of its agreements with the independent manufacturing facilities. Otherwise, the development, manufacturing and shipment of inventory will cease. If SHC is not permitted to pay its employees and other critical expenses immediately and in the ordinary course of its business, SHC likely will be required to cease operations temporarily, which will be extremely damaging, if not fatal, to SHC's business. Therefore, SHC's interim use of cash collateral is necessary to avoid immediate and irreparable harm to SHC and its bankruptcy estate.

42.    The Debtors have agreed to offer the Senior Secured Lenders adequate protection in the form of replacement liens and payment of interest on prepetition debt that has accrued prior to the petition date and that accrues postpetition. By granting such replacement liens in favor of the Senior Secured Lenders as adequate protection, the Debtors offer security to the Senior Secured Lenders with respect to their interest in the Cash Collateral and SHC will be able to maintain the liquidity necessary to meet its business needs, including payroll obligations.

43.    Because budget projections are forward-looking, they can never be entirely accurate. I believe that SHC will be able to adhere to the Budget within a variance of 15% for any particular line

---

1  The Budget may be amended or modified until a final hearing on the Cash Collateral/DIP Motion can be held.

item in the Budget, or 10% in the aggregate.  Under this structure, SHC will have the flexibility to operate its business without disruption.

44.   As of the Petition Date, the actual and projected income to SHC generated from the sales of its products is not likely sufficient to maintain SHC's business operations post-petition.  Over the next thirteen weeks (the time period covered by the Budget), SHC anticipates that it may need to borrow approximately $3.3 million under the DIP Agreement.  Moreover, fluctuations in the market and unforeseen circumstances could lead to additional cash flow requirements.  In addition to the projected cash flow needs, to instill confidence in SHC's creditors, vendors, customers, employees and other parties in interest, SHC desires to have debtor-in-possession financing in place to draw upon in the event of an emergency or an unexpected adverse change in its business.

45.   Concurrent with the filing of this Declaration and subject to the Court's approval, the Debtors, BMO and certain other lenders that may become party thereto from time to time (collectively, the "DIP Lenders") have negotiated, and are prepared to execute a Debtor In Possession Credit Agreement (the "DIP Agreement"), a true and correct copy of which is attached hereto as Exhibit M, on the terms set forth in the proposed order, a true and correct copy of which is attached hereto as Exhibit N ("Proposed DIP Order"), and the Debtor In Possession Security Agreement, a true and correct copy of which is attached hereto as Exhibit O.  As provided for in the DIP Agreement, the cost of establishing the DIP financing is $100,000, which the Debtors believe is far outweighed by the benefits to the estate.

46.   Without acquiring post-petition financing, SHC may not be able to continue to operate its business in the ordinary course and consummate a plan of reorganization to maximize recovery for its creditors and stakeholders.

47.   Post-petition financing will allow SHC to continue its business operations uninterrupted, which will enable SHC to maximize the value of the business as a going concern with the goal of a successful reorganization.  Moreover, BMO has stated that it is unwilling to extend credit to the Debtors on an unsecured or unsecured priority basis.  I believe that it is necessary, to acquire the financing that SHC will require, to provide the DIP Lenders with super-priority administrative expense status under Bankruptcy Code section 364(c)(1).  I believe that the proposed

DIP Agreement and the Proposed DIP Order provide terms that are fair and reasonable and in the best interest of the Estates and creditors.

48.     SHC received two other offers for debtor in possession financing.  NML offered debtor in possession financing to SHC pursuant to Bankruptcy Code section 364(c).  A true and correct copy of NML's debtor in possession financing term sheet is attached hereto as Exhibit P.  However, the current form of NML's proposed debtor-in-possession financing prohibits SHC from entering into an agreement with the Plan Sponsor to effect the consummation of the proposed Plan.  Further, NML's proposed debtor in possession financing contained several other objectionable terms.  Moreover, given NML's prior threat of litigation against the Plan Sponsor, any future debtor-in-possession financing proposal by NML would also likely prevent the proposed Plan.  As such, any NML debtor-in-possession financing would almost certainly prevent the SHC from maximizing the value of the estate for all stakeholders.  Additionally, in conjunction with previous negotiations regarding an asset sale process, the Plan Sponsor offered to allow SHC to use the Plan Sponsor's $2.3 million deposit that would have been made in connection with the potential asset sale as debtor-in-possession financing on a super-priority administrative basis.  Not only was such deposit less than half the amount provided under the DIP Agreement and not likely to cover the expenses over the next thirteen (13) weeks, but SHC's use of such debtor-in-possession financing would have made the Plan Sponsor a super-priority administrative creditor, which may have created unforeseen issues in the sale process.  Moreover, it would likely have taken significant time to negotiate an acceptable agreement with the Plan Sponsor.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of December, 2010 at Los Angeles, California.

_____/s/ T. Scott Avila_____
                        T. Scott Avila

# Exhibit A



# ORGANIZATIONAL CHART

Sexy Hair Concepts, LLC, Ecoly International, Inc., Luxe Beauty Midco Corporation, Luxe Beauty Holdings Corporation

| Thoma Cressey Bravo 37.4% | Northwestern Mutual 8.2% | PPM 6.7% | Bruce Olson 16.3% | Douglas Von Allmen 16.3% | James Morrison 15.1% |

Luxe Beauty Holdings Corporation
(DE C-Corp.)

100%

Luxe Beauty Midco Corporation
(DE C-Corp.)

29.46%

Ecoly International, Inc.
(CA C-Corp.)

70.54%

100%

Sexy Hair Concepts, LLC
(CA LLC)